UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


JOHN JANSEN                          :
                                     :
                                     :
                                     :
                                     :   CIVIL ACTION NO.:
V.                                   :   CCB-04-610
                                     :
                                     :
                                     :
STEPHEN J. BAKER, et al.             :
                                     :
                                     :
                                     :
                      ..o0o..

## **MEMORANDUM**

Now pending before the court are cross-motions for summary judgment in this legal malpractice action.  The issues have been fully briefed and no hearing is necessary.  Local Rule 105.6. For the reasons that follow, both motions for summary judgment will be denied.


## **BACKGROUND**

John Jansen has sued his former attorney, Stephen J. Baker, and Baker's former law firm, Baker, Thomey and Emrey, P.A., for negligence.  Jansen is a resident of Fort Bend County, Texas and Baker is a resident of Cecil County, Maryland.  In 1990, Jansen purchased two parcels of land, totaling forty-four acres, from the Atkinson family for approximately $ 82,721.  (*See* Defs.' Mot. for Summ. J., Ex. 1, Jansen Dep. at 9-12.)  The first parcel, roughly 38 acres, described by the parties as "the triangle," was undeveloped except for a basic cinderblock building.  (*Id.* at 13-14.)  The second parcel was six acres and was described as a small "leg"

with an old dirt and gravel driveway by which one could access the larger parcel of land. (*Id.* at 16-17.) There was no other way to access the larger parcel of land, though there is another unimproved driveway on the 38 acre tract. (*Id.* at 15-18.) The unimproved driveway on the 38 acre triangle ran into a rough road that continued across an adjacent piece of property owned by A.P. Green Brick Company. (*Id.* at 17-18.) There was no deed or legal instrument that gave the 38 acre parcel a legal right to use the driveway running across the A.P. Green Brick Company property, and apparently, though contacted by Jansen or his real estate agent, the company was unwilling to do anything to provide access. (*Id.* at 19, 169.) The smaller "leg" of land was bordered by Stony Run Creek on the east side and abutted Razor Strap Road on the south side. (*Id.* at 9; *see also* Defs.' Mot. for Summ. J., Ex. 2 at 5.) Stony Run Creek runs parallel to the driveway on the small leg of land, and then traverses part of the 38 acre triangle. (*See* Defs.' Mot. for Summ. J., Ex 2 at 5.) The six acre tract contained a little garage and an old barn. (Defs.' Mot. for Summ. J., Ex.1, Jansen Dep. at 12.)

      At some point leading up to the purchase of the Atkinson property, Jansen determined that there were conflicting land records for the six acre leg. The Atkinson deed indicated ownership of the property between Stony Run Creek up to and including the existing gravel driveway and beyond. The neighboring property owner, Mrs. Novotny, had a deed that reflected ownership of the same driveway and land comprising the leg. (*See* Defs.' Mot. for Summ. J., Ex. 2, Right of Way, Access and Boundary Line Agreement.) Jansen retained Joy Ray of Conestoga Title, his title insurance company, to research historical records that might indicate how the 38 acre parcel of land had been accessed historically, and how the six acre leg had been used. (Ex. 1, Jansen Dep. at 169.) Ray determined that the existing gravel driveway on the six acre leg had

been used for hundreds of years to access the 38 acre triangle. (*Id.* at 170.)

Around this same time, Jansen retained Stephen Baker, at the time a partner with the firm Baker, Thomey and Emrey, P.A., to advise him as to how to secure access to the land he wanted to purchase. (Pls.' Mot. for Summ. J., Ex. A., Baker Dep. at 10-11.) Baker had a "general country practice," handling a range of matters including domestic work, negligence cases, and real estate settlements. (*Id.* at 8.) Baker had some, but not extensive, experience working with property developers. (*Id.* at 15.) According to Jansen, Baker advised him that he needed an agreement with Mrs. Novotny to access the land, and that "if [he] wanted to develop the property, it could be valuable to have additional access to the property." (Ex. 1, Jansen Dep. at 181-182.) Because Jansen did not have money to purchase additional property, Baker suggested he negotiate an option agreement with Mrs. Novotny. (*Id.*) Thereafter, Terry McFarland went with Jansen to meet with Mrs. Novotny to see if they could negotiate an agreement that would grant Jansen access along the existing driveway and finalize an agreed upon boundary line between the two properties. (*Id.* at 171-172.) Mrs. Novotny, who at the time was 90 years old and acting through her guardian Thomas Sullivan, agreed to grant Jansen half of the existing driveway, thereby fixing the boundary line as the centerline of the driveway, except for one 65 foot area around an existing building that would remain shared property. (Ex. 2, Right of Way, Access and Boundary Line Agreement.) She further agreed to share the maintenance and ownership of the shared portion of the driveway, and she granted an easement for access to Jansen as well as a utility Right of Way across the Novotny property. (*Id.* at 3.) Finally, she also granted Jansen "the option to upgrade and/or replace the shared portion of the driveway, to county standards acceptable at the time, for dedication...Novotny and [Jansen] would agree to

donate approximately 60 feet (+/- 10 feet) on each side of the driveway per county standards for dedication."(*Id.* at 3.)  In exchange, Jansen paid an estimated $7,500 for a new survey for the Novotny land, and all the costs associated with drafting and recording the new deeds.  He also paid half of the cost of grading and graveling the shared access portion of the driveway, repaired a bridge, and agreed to share maintenance costs for the shared portion of the driveway.  In addition, Jansen agreed to pay for "all road construction/replacement/upgrade costs and preparation and filing of the option agreement."  The Right of Way, Access and Boundary Line Agreement was executed on August 11, 1990.  (*Id.*)

According to Jansen, the terms of the separate option agreement were negotiated by Terry McFarland and Mrs. Novotny, with the assistance of her guardian, Thomas Sullivan.  (*Id.* at 172,188.) Baker did not negotiate the option agreement, but he drafted it. (Pls.' Mot. for Summ. J, Ex. A, Baker Dep. at 11, 24-25.) The option agreement referenced the Right of Way, Access and Boundary Line Agreement, and provided that, in exchange for one dollar paid by Jansen, Mrs. Novotny would grant him "the exclusive right and option....to acquire title in fee simple" of a 75 foot wide parcel of land.  (Pls.' Mot. for Summ. J., Ex. B, Option Agreement at 1-2.)  The agreement specified that "the Option hereby granted shall remain in effect for a period of Fifty (50) years from the date hereof." (*Id.* at 2.)  In order to exercise the option, Jansen was to give written notice to Thomas Sullivan.  Upon doing so, once the land was conveyed, Jansen was required to, within a reasonable time, "[c]onstruct a road to Cecil County specifications upon the land extending from Razor Strap Road to [the 38 acre triangle]."  (*Id.* at 4.)  Mrs. Novotny would have the right to use the roadway to access her adjacent property, and Jansen would then "convey said roadway to Cecil County to become a public road."  (*Id.*)  The agreement provided

that if "Cecil County fails or refuses to accept said roadway as a public road, then [Jansen] shall be responsible for the reasonably necessary maintenance thereof." (*Id.*)  The option agreement was signed by Sullivan and Jansen on September 12, 1990. (*Id.* at 5.)

According to Jansen, he did not tell Baker what to include in the agreement, but they did discuss the terms of the option agreement. (Ex. 1, Jansen Dep., 174, 184-187.)  For example, Jansen felt it was not fair "to take her land until I knew I had the resources and the timing was correct for development." (*Id.* at 184.)  Baker, in turn, apparently indicated that Jansen need not pay for the option immediately because he could have the option for 50 years. (*Id.*)  Baker recalled that he chose the period of 50 years because he "thought that that would be adequate for [Jansen's] needs" and that "[Jansen] wanted it to last as long as he could make it last." (Pls.' Compl., Ex. A, Baker Dep. at 28-29.)  Baker said that he did not do any research as to the 50 year term and that he had not used that particular number in an option agreement before. (*Id.* at 29.)  Jansen explained that he did not exercise the option at the time the agreement was drafted because he "didn't feel that the development of Cecil County at that time would warrant the development" and that he "wanted it to be at a time when it was appropriate for the development." (*Id.* at 185.)  Jansen had Baker review the aforementioned agreements, as well as the title and title insurance policy, before he went to closing on the sale of the two parcels of Atkinson property. (*Id.* at 186.)  Baker informed Jansen that the title insurance company had insured everything but the option agreement, but that he didn't think there was anything to worry about because the option agreement was good. (*Id.* at 187.)  Shortly thereafter, Jansen closed on the Atkinson property in September 1990.  Aside from upgrading the shared portion of the driveway and repairing the bridge, Jansen has made no improvements to the property since he

5

purchased it. (*Id.* at 12, 14.)

In January 2002 Jansen received a summons from the Circuit Court for Baltimore County indicating that he had been sued by the Beneficial Mortgage Corp. (Pls.' Compl., Ex. A, Summons and Quiet Title Complaint.)  The Beneficial Mortgage Corp. had acquired the property formerly owned by Mrs. Novotny through a foreclosure sale, and had subsequently learned that the property was subject to the option agreement with Jansen.  The complaint sought a declaratory judgment and order stating that the option agreement violated the rule against perpetuities and was therefore null and void, and, consequently, the Beneficial Mortgage Corp. held all of the land free and clear of any claim by Jansen.  (*Id.*)  On or about May 23, 2002, judgment was entered against Jansen and in favor of Beneficial Mortgage Corp. because the option agreement violated the rule against perpetuities (hereinafter "RAP").  (Pls.' Memo. in Opp'n, Ex. F, Circuit Court for Baltimore County Order.) Under Maryland law, an option agreement that is not limited to the grantee must be limited under the RAP to a period of 21 years to be legally valid.  (Compl. ¶ 10) (citing Laurence M. Jones, *Reforming the Law–the Rule Against Perpetuities*, 22 Md. L. Rev. 269, 273 (1962)).

Jansen filed suit in this court on March 1, 2004, claiming that Baker, while acting as an agent of Baker, Thomey and Emrey, P.A., breached his duty of care to Jansen by failing to diligently prepare and draft an option agreement that complied with Maryland law. (Compl. ¶¶ 16-17.)  Jansen claims that a reasonable and prudent attorney would have explored the applicability of the RAP to the option agreement prior to its execution. (*Id.* at 16.)  As a result of Baker's alleged breach, Jansen claims that he suffered damages when he lost a secure interest in public road access to his property and that the loss of the option has decreased the value of his

land and its potential for development. While Jansen himself is not a developer, he apparently planned to sell the land to a real estate developer. Jansen is seeking a jury trial and $ 1 million dollars in compensatory damages plus interest and costs.

The parties have provided expert testimony as to the value of the land "as is," and the expected value if it had public access and could be developed with multiple housing units. The experts have also assessed the likelihood of Jansen or a subsequent owner being able to secure the necessary approval from Cecil County that would be required to upgrade the driveway to a public road that meets county specifications, as the option agreement requires.

The plaintiff's expert appraiser, Emerson Treffer, testified that if used as a single family lot, the as is value of Jansen's land is about $ 350,000. (Pls.' Memo. in Opp'n, Ex. B, Treffer Dep. at 32.) The "platted" market value of the property, that is, property with substantially all government approval for access and development, would be approximately 1.6 million to 2 million dollars. (*Id.*) With the 75 foot option parcel, but with uncertainty as to obtaining government approval for access and development, the market value of the Jansen property is approximately 50% less than the platted value, or between $750,000 and $867, 500. (*Id.* at 86-87; *see also* Pls.'Memo. in Opp'n, Ex. D, Appraisal Summary at 2.) According to the current record, Treffer apparently did not indicate an estimated value of the land to a developer (i.e., the investment value) without the option, though he did opine that having to access the property through potential alternate routes, rather than the 75 foot option, would decrease the value of the land because the other routes weren't as nice. (*Id.* at 139, 185-186; *see also infra* at 10.)[1]

---

[1] The parties have provided only short excerpts of the apparently lengthy deposition testimony from Treffer. It is difficult on the current record, therefore, to know the exact values he assigned to the Jansen land with or without the option, and with or without access for

Case 1:04-cv-00610-CCB   Document 27   Filed 08/25/05   Page 8 of 14

Overall, Treffer explained that he believed the market value for the property would be on the higher end because land is so scarce, and therefore investors are more willing to purchase the land and assume the risks necessary to get it platted. (*Id.* at 135.)

Treffer testified that during meetings with county officials, he was told that Jansen's property had been purposefully designated for multi-family high density development, and that "they were quite encouraged that Mr. Jansen was going to try to develop this property per the zoning." (Ex. B, Treffer Dep. at 34.) When asked whether he thought the county would likely approve putting in a public roadway on the option land, Treffer noted the existing driveway in that area, and explained that "it has been my experience that the counties are willing to engineer property where they feel their tax base is going to be enhanced." (Treffer Dep. at 21.)

Wayne Newton, a consulting engineer hired by Jansen to investigate access and development issues associated with his property, confirmed that portions of the existing driveway within the 75 foot option parcel run through a floodplain, and that "floodplain construction is only allowed via a waiver." (Defs.' Mot. for Summ. J., Ex. 4, Newton Dep. at 68.) In his view, "given the fact that there is an existing driveway... in the location of this proposed driveway, those waivers, if they were sought, I believe would be–have a better chance of being approved," although he could not state with a reasonable degree of engineering certainty that they would be approved. (*Id.* at 68-69.) He also testified that the county requires a 110 foot buffer zone on either side of a stream such as Stony Run Creek; you may not build or develop a roadway within the zone without a waiver. (*Id.* at 70.) Newton stated that part of the

---

development, thought it appears he believed the property value differed depending on the particular facts to be assumed.

proposed driveway was within the 110 foot buffer and therefore a second waiver would be needed to develop the road. (*Id.* 71.) He could not state with a reasonable degree of engineering certainty that the county would approve such a waiver, but he agreed that the county would prefer to find access that doesn't require such a waiver. (*Id.*) The defendants' expert, Tory Pierce, stated that he believes the only way to use the 75 foot option parcel without disturbing the floodplain would be to construct a thousand foot bridge or causeway through the strip, and that the county would "probably not" grant the waivers necessary for the project. (Defs.' Mot. for Summ. J., Ex. 6, Pierce Dep. at 62.)

      Newton and Jansen met with a Cecil County technical advisory committee on September 1, 2004 to discuss preliminary plans for a 156 townhouse development on the Jansen property. (*See* Pls.' Memo. in Opp., Ex. E, Newton Letter.) The officials told them it was not the county's job to find Jansen access, but they did discuss two alternative ways to access the Jansen property: (1) through property owned by Peter O'Rourke; and (2) through the nearby Northwoods housing development. Since the meeting, Jansen has been trying to discuss access with O'Rourke, but so far has not made any progress on this front. (Ex. 4, Newton Dep. at 35-36.) Newton explained that based on his past experience, once a townhouse development such as the one proposed by Jansen comes in for approval, the county has "asked [other] developers to provide access to landlocked parcels." He stressed that the county did not say they would require others to give access to Jansen, but, in his opinion, if O'Rourke were planning to develop townhomes on his property, the county would probably require O'Rourke to give access to Jansen through his property. (*Id.* at 38-39.)

      Newton said that the county was not "as cooperative or willing to discuss access

[through] Northwoods," because the roads in Northwoods that would feed into Jansen's property were not built to standards required for heavier traffic flow. (*Id.* at 39-40.) Therefore, any access through Northwoods would require construction and changes to the roads in that development. This would also be a "tremendous undertaking" because Jansen would likely have to negotiate right-of-away access with individual owners. (*Id.* at 33.) Newton told Jansen that, in his opinion, accessing his property through the Northwoods development, assuming roads were adequate for access, would be much cheaper and easier than through the 75 foot option parcel off of Razor Strap Road. (*Id.* at 26.) Finally, Newton noted that a main obstacle to development would be the need to build a bridge or box culvert in order to cross Stony Run Creek, if the property was to be accessed through the adjacent Northwoods development or from Razor Strap Road. (*Id.* at 52-53.) He stated, however, that if Jansen didn't have access through Northwoods, then he "certainly would" need to exercise his 75 foot option. (*Id.* at 25.) In addition, Treffer testified that access via the option would be preferable to the other routes, because the neighborhood along Razor Strap road is nicer. The other routes require driving by junk yards and areas that are "not as pristine." (Treffer Dep. at 185.) Consequently, Treffer reasoned that access through the O'Rourke property or Northwoods would decrease the value of Jansen's property, as compared to the more desirable access through the option connected to Razor Strap Road. (Treffer Dep. at 186.)

When Newton met with the county committee, he only had prepared a preliminary concept plan, not a finished platted plan that addressed water management, road design, sewer design, and other infrastructure issues. (*Id.* at 48-52.) While he acknowledged much more work needed to be done, in his opinion, "[a]ssuming adequate access were provided, I believe a plan

10

similar to [the 156 townhouse plan proposed by Jansen] will be approved" by Cecil County. (*Id.* at 37.)

## ANALYSIS

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In Maryland, in order to prevail on a claim for legal malpractice, a plaintiff must prove: (1) the attorney's employment; (2) his neglect of a reasonable duty; and (3) that such negligence resulted in and was the proximate cause of loss to the client. *See Cavacos v. Sarwar,* 545 A.2d 46, 48 (Md. 1988); *see also Shofer v. Stuart Hack Co.,* 723 A.2d 481 (Md.1999) (listing similar factors for a basic negligence claim). The third factor is the focus of the pending motions in this case.[2]

In order to satisfy the causation element of a negligence claim, the plaintiff must "prove by a preponderance of the evidence that defendant's breach of duty caused the plaintiff's injury. In other words, the plaintiff must prove the defendant's breach of duty was more likely than not (*i.e.,* probably) the cause of injury." *Hurley v. U.S.,* 923 F.2d 1091, 1094 (4th Cir. 1991) (internal citations omitted). Expert testimony is admissible only when necessary to aid the fact finder's understanding of technical matters that are beyond the general knowledge of the average

---

[2]Baker's counsel argues that the mere fact "that Baker violated the Rule against Perpetuities does not automatically constitute a breach of the applicable standard of care," because the RAP is "a complicated area of property law that has 'long perplexed the courts and the bar.'" (Defs.' Memo. in Opp'n at 6) (citing *Lucas v. Hamm,* 56 Cal. 2d 583, 592 (1961)). Jansen's counsel has submitted an affidavit from Maryland real estate lawyer David H. Fishman, who averred that a competent attorney practicing in Maryland in 1990 should have known that real estate purchase options were subject to the RAP, based on the prevailing case law at the time, the Restatement of Property, and various Maryland legal news articles. (Pls.' Mot. for Summ. J., Ex. D.) The defendants have not rebutted the Fishman affidavit, and their reliance on California state law is unavailing. The fact that the insurance company refused to insure the option agreement also should have alerted an attorney to the need to investigate the possible legal shortcomings of the option agreement.

layperson. *Hartford Accident and Indem. Co. v. Scarlett Harbor Assoc.,* 674 A.2d 106, 125-26 (Md. 1996). When necessary, expert testimony may be submitted to establish causation and future damages, but such testimony must demonstrate the likelihood of causation or damages to a degree of "reasonable probability" or "reasonable certainty" because "in matters of proof, neither the Courts nor the juries are justified in inferring from mere possibilities the existence of facts, and they cannot make mere conjecture or speculation the foundation of their verdicts." *Davidson v. Miller,* 344 A.2d 422, 427 (Md. 1975) (citing various Maryland cases that hold that testimony must demonstrate more than a mere possibility that an event occurred or would likely occur); *see also Cooper v. Hartman,* 533 A.2d 1294, 1299 (Md. 1987) ("In Maryland, recovery of damages based on future consequence of an injury may be had only if such consequences are *reasonably probable or reasonably certain*. Such damages cannot be recovered if future consequences are 'mere possibilities.'") (citing *Pierce v. Johns-Manville Sales Corp.,* 464 A.2d 1020 (1983)). Likewise, although it may be difficult to ascertain future damages, this does not bar recovery. The evidence need only establish a rational, non-speculative basis from which a fact finder can make a fair and reasonable estimate of damages. *Brock Bridge Ltd. Partnership, Inc. v. Development Facilitators, Inc.*, 689 A.2d 622, 628-29 (Md. 1997).

     Here, the defendants argue that the plaintiffs' experts have failed to establish with reasonable probability that Jansen would have been able to develop a public road in accord with county standards, and consequently develop the property in the most profitable manner possible, as he claims the option agreement would have enabled him to do. Therefore, the defendants argue, Jansen has not shown that Baker's breach caused him to suffer damages. While it is true that plaintiff's experts were not able to state with reasonable certainty or reasonable probability

13

that Cecil County officials would grant the necessary waivers to build a public roadway on the option land, Jansen also has provided expert testimony from Emerson Treffer that, regardless of the uncertainties associated with the option, the loss of the option probably has decreased the investment value of the land.[3]  (*See* Treffer Dep. at 86-87, 136-139, 185-186.)  Therefore, there remains a genuine issue of material fact as to whether the loss of the option resulted in any damages to the plaintiff.  Given this factual issue, neither party is entitled to summary judgment.

## **CONCLUSION**

Because there is a genuine issue of material fact as to whether the value of Jansen's land has decreased as a result of the loss of the option to purchase and develop the 75 foot parcel, the summary judgment motions will be denied.

A separate Order follows.

<table>
<tr><td>   August 25, 2005   <br>Date</td><td>              /s/              <br>Catherine C. Blake<br>United States District Judge</td></tr>
</table>

---

[3]The central issue is not whether Jansen would have gotten Cecil County approval for building a road on the 75 foot option parcel, but whether there is a difference in property value with the option or without the option.  Notwithstanding the fact that the parties have only provided excerpts of deposition testimony from Treffer and the other experts, based on the current record, it appears that a developer would be willing to pay more for the Jansen land if it had three potential avenues for access, rather than the two that remain through the O'Rourke or Northwoods properties.